IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-20115
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RONALD A PIPERI,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas
(CR-H-93-0134-02)
_____
October 17, 1996

Before KING, SMITH, and WIENER, Circuit Judges.

PER CURIAM:[*]

Ronald A. Piperi appeals his conviction by a jury of three counts of bank bribery and one count of misapplication of funds. Finding no reversible error, we affirm.

## I.  BACKGROUND

### A. FACTS

In the light most favorable to the verdict, the facts are as follows.  In 1983, Ronald A. Piperi ("Piperi") acquired a

_____

[*]Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

controlling interest in First Savings Association of Orange, Texas ("Orange Savings"). From 1983 to 1987, Piperi was responsible for all major decisions of Orange Savings and was involved in its commercial lending. Ronald Drew Piperi ("Drew Piperi"), Piperi's son, began working at Orange Savings in 1983 as an assistant vice president and loan officer. Joseph E. Russo ("Russo") owned a real estate company called the Russo Companies, as well as a controlling interest in Ameriway Savings Association, Houston, Texas ("Ameriway Savings") and Ameriway Bank/Woodway, National Association, Houston, Texas ("Ameriway Bank") (collectively, "the Ameriway Institutions").

### 1. Orange Savings loans $1.5 million to Russo

In July 1985, Steve Raab, vice president in charge of real estate lending at Orange Savings, met Russo, and they discussed forming a working relationship.  In November 1985, Raab sent a letter to Michael Liss, a Wall Street investment banker, stating that Orange Savings would lend the Russo Companies $20 million to acquire a company called UPI.  Although Piperi characterizes this letter as a commitment letter, the government contends that Raab intended it only as an expression of interest in the transaction and that Russo did not rely on the letter as a firm commitment. Two banking experts testified at trial that the letter was not a binding commitment letter.

Orange Savings loaned $1.5 million to the Russo Companies on June 9, 1986. Joanne Pizzigno, the loan administrator at Orange Savings, did not learn about this loan until she saw a voucher reflecting the wire transfer of the proceeds after the date the loan was funded, although her job responsibilities included initialing such vouchers. The loan file indicated that Drew Piperi was the loan officer and contained a loan committee submission sheet dated June 6, 1986 and initialed by Piperi, which indicated that the loan committee had approved the loan. However, Pizzigno did not remember the loan committee discussing this loan, nor did the loan committee meeting minutes reflect such a discussion. Raab signed the loan committee submission sheet without reviewing relevant information about the Russo Companies because either the loan had already been made or he knew that Piperi had decided to fund it. The loan file also included a certification by Drew Piperi that certain documents were in the file before the loan was funded; however, many of these documents were dated after June 9, 1986, including the Russo Companies's corporate resolution authorizing the loan, the Dunn & Bradstreet report and the payment analysis report on the Russo Companies, and Russo's personal credit report.

The loan file contained two loan applications. The first was dated June 2, 1986 and listed the Russo Companies as borrower and guarantor and Russo as the principal of the borrower. It described an unsecured loan for $1.5 million, payable in a single

4

payment at the end of a six-month term at 10.5% interest.  It identified the loan as an unsecured line of credit, of the type used by commercial entities to meet daily operational expenses.  The second loan application listed the purpose of the loan as to purchase corporate stock and listed cash flow from operations as the source of repayment.  Although Russo was listed as guarantor, the loan file did not contain a duly executed guaranty agreement.  The proceeds of the loan to the Russo Companies were used to purchase stock, in Russo's name, in a company coming out of bankruptcy called New UPI.

Although Orange Savings had no written loan policies at the time this loan was funded, Pizzigno was in the process of preparing a policy manual, which was approved in 1987.  This policy manual considered an unsecured loan to be a high-risk loan and required personal guarantees of individuals for such loans to be made to a commercial entity.

A June 2, 1986 letter from Drew Piperi to Russo discusses the Orange Savings loan to the Russo Companies and the Ameriway Institutions loan to Drew Piperi, guaranteed by Piperi.  In the letter, Drew Piperi stated: "Once the dust settles, I believe prudent lending dictates that we each offer sufficient collateral securitizing these loans in an attempt to escape criticism for [sic] our respective examiners."

5

## 2. Ameriway Institutions loans $750,000 to the Piperis

Ameriway Bank and Ameriway Savings jointly loaned $750,000 to Drew Piperi, with Piperi as guarantor, also on June 9, 1986, the same day as the Orange Savings loan to Russo. On that day, Russo, Piperi, Drew Piperi, Mike Ballases (chairman and president of Ameriway Savings), and Kathy Gamel (senior vice president of Ameriway Bank), met in Ballases's office to discuss a loan to Drew Piperi for the purchase of an unidentified savings and loan institution. However, various documents related to the loan listed its purpose as personal investment, personal business needs, or corporate purposes and operations. The Piperis wanted the loan funded that day, although they had no collateral; they promised to deliver sufficient real property as collateral within 30 days. Russo decided to fund the loan, with $300,000 being provided by Ameriway Bank and $450,000 being provided by Ameriway Savings. The only information relied upon in funding the loan was Piperi's personal credit report.

Gamel penned and Russo approved a memo authorizing funding of a $300,000 loan from Ameriway Bank to Drew Piperi with Piperi as guarantor for a twelve-month term at 10.5% interest. Russo, as well as the Ameriway Bank loan committee, had authority to approve loans up to the bank's lending limits; Gamel testified that Russo had never before used his individual authority to approve a loan. Additionally, the loan to Drew Piperi violated

6

Ameriway Bank's written policy that accommodation loans to poor credit risks on the strength of a guarantor were undesirable.

Ballases authorized a $450,000 loan from Ameriway Savings to the Piperis. The next day, June 10, 1986, Ballases wrote a memo to the Ameriway Savings loan committee advising that the loan was made on Russo's recommendation, and that it was without collateral but would be fully collateralized within 30 days. Additionally, the memo indicated that the source of loan repayment would be Drew Piperi's "personal cash flow," described as in excess of $2 million annually. However, Drew Piperi's personal financial statement, dated June 2, 1986, listed his annual income as $50,000.

The $750,000 loan proceeds from the Ameriway Institutions were used to pay Piperi's overdraft caused by payments to brokerage firms to acquire stock, including Flexible Computer stock, on May 30 and June 2, 1986. At the end of July, Piperi provided Ameriway Bank with 40,000 shares of Flexible Computer stock, worth $9 per share, as collateral for the loan.

### 3. The Submission of False Financial Information

Piperi, Drew Piperi, and Russo made false presentations of their financial situations in acquiring these loans. Piperi's financial statement in support of the Ameriway Institutions loan listed his net worth, cash on hand, and assets. The financial statement explicitly stated that it showed all of Piperi's

liabilities.  However, Piperi omitted numerous liabilities from his financial statement and overvalued many of his assets.  Russo similarly overstated the value of assets and underestimated and omitted liabilities on his personal financial statements as well as the financial statements regarding the Russo Companies.

State regulations governing Orange Savings and Ameriway Savings required current and complete financial information on a borrower to be on file before a savings and loan could fund a loan.  The required documentation included: an application identifying the borrower; if the borrower is a corporation, a corporate resolution authorizing the loan; the purpose of the loan; security for the loan; the source of repayment; and current financial statements of the borrower and guarantors.  The documentation provided by the Piperis and Russo did not satisfy these regulations.

### 4. Conflict of Interest

In 1986, the Texas Savings and Loan Department required institutions to disclose all loans outstanding to officers, directors and principal stockholders of other financial institutions in order to detect potential conflicts of interest. Additionally, Ameriway Bank had an ethics policy requiring all officers and employees to avoid investments that could interfere with their independent exercise of judgment in the best interest of the bank, and to disclose any interest presenting a potential

8

conflict.  However, at the meeting discussing the Ameriway Institutions' loan to the Piperis, Russo did not disclose that he was receiving a $1.5 million loan from Orange Savings, an institution owned by Piperi.  Similarly, the loan from the Ameriway Institutions to the Piperis was not disclosed at the time the loan from Orange Savings to Russo was authorized.

### 5. Mutual Reduction of Interest and Renewal of the Loans

On January 5, 1987, Drew Piperi wrote to Russo requesting a reduction in the interest rate on the Ameriway Institutions loan.  On January 16, 1987, Russo sent Drew Piperi a renewal note on his loan and told him that the interest rate would be reduced "effective the same date our note is effective."  The Russo Companies's loan, which was in arrears, was renewed at a reduced interest rate in February 1987.  In late February and early March, the Ameriway Institutions reduced the interest rates on the Piperis' loan at Russo's request.  In June 1987, the Ameriway Institutions agreed to renew the loan to the Piperis, although the value of the collateral for the loan, the Flexible Computer stock, had decreased dramatically.  At the time of renewal, Piperi agreed to put up additional collateral within 90 days; however, he later refused to do so, claiming that no collateral was required on the original loan.

### B. PROCEDURE

Piperi was charged by indictment with conspiring with Russo and Drew Piperi to commit bank fraud, bank bribery, misapplication of bank funds and to defraud the United States (count 1; 18 U.S.C. § 371); with bank fraud (counts 2, 3, and 4; 18 U.S.C. § 1344); with bank bribery (counts 5, 6, and 7; 18 U.S.C. § 215); and with misapplication of bank funds (counts 8, 9, and 10; 18 U.S.C. §§ 656-57).

The government's theory was that Piperi committed bank fraud[1] by intentionally deceiving the Ameriway Institutions and Orange Savings about his financial status, the reciprocal nature of the loans, the purpose of the loans, and the accuracy of the documentation supporting the loans in order to receive a loan from the Ameriway Institutions. The government asserted that Piperi committed the crime of bank bribery[2] because Piperi, as an officer of Orange Savings, corruptly solicited a loan from the Ameriway Institutions by providing false financial information,

---

[1]  Bank fraud requires two basic elements:  "(1) the defendant executed or attempted to execute a scheme or artifice to defraud or obtain money or funds from a financial institution by false or fraudulent pretenses; and (2) the defendant knowingly and willfully committed the action or actions necessary to perpetrate that fraud."  *United States v. Farmigoni*, 934 F.2d 63, 66 (5th Cir. 1991), *cert. denied*, 502 U.S. 1090 (1992).

[2]  To establish bank bribery, the government must prove that: (1) the defendant is an officer, director, employee, agent or attorney of a financial institution; (2) he corruptly solicited or demanded for the benefit of any person; (3) a thing of value (exceeding $100) from any person; (4) intending to be influenced or rewarded in connection with any business or transaction of such institution.  *United States v. Brunson*, 882 F.2d 151, 154 (5th Cir. 1989).

10

misrepresenting the true purpose of the loan and the status of the loan documentation, and failing to disclose that the loan was made in exchange for a reciprocal loan to Russo. The government's misapplication[3] theory was that Piperi misapplied Orange Savings's funds by causing it to loan money to Russo without due diligence when Russo's credit was very risky and without disclosing Piperi's intent in making the loan to secure a reciprocal loan from the Ameriway Institutions.

Piperi was convicted by a jury on the three counts of bank bribery (counts 5, 6, and 7) and one count of misapplication of funds (count 9); he was acquitted on the other two misapplication charges (counts 8 and 10). The jury failed to reach a verdict regarding the conspiracy and bank fraud charges (counts 1, 2, 3, and 4). Piperi was sentenced to 41 months imprisonment and 2 years of supervised release and was ordered to pay $200 in special assessments, a $10,000 fine, and $323,992.90 in restitution.

Piperi filed a timely notice of appeal from his conviction and sentence. On appeal, Piperi raises seven points of error,

---

[3] To establish misapplication of funds, the government must prove that: (1) the savings and loan institution was authorized under United States law; (2) the accused was an officer, director, or employee of the institution; (3) the accused knowingly and willfully misapplied the funds of the institution; and (4) the accused acted with intent to injure or defraud the institution. *United States v. Parks*, 68 F.3d 860, 863 (5th Cir. 1995), *cert. denied*, 116 S. Ct. 825, *and cert. denied*, 116 S. Ct. 1028 (1996).

11

arguing insufficient evidence to support his convictions, error in admission of certain pieces of evidence, prosecutorial misconduct during closing argument, improper jury instructions, and improper sentencing because of misapplication of the United States Sentencing Guidelines.

## II.  DISCUSSION

### A.  EVIDENTIARY POINTS

#### 1.  *Standard of Review*

We review the district court's evidentiary rulings for abuse of discretion.  *Parks*, 68 F.3d at 867.  This standard includes evidentiary rulings regarding the admission of expert testimony, *United States v. Willey*, 57 F.3d 1374, 1389 (5th Cir.), *cert. denied*, 116 S. Ct. 675 (1995), and extraneous conduct, *United States v. Coleman*, 78 F.3d 154, 156 (5th Cir. 1996), *cert. denied*, 1996 WL 426696 (U.S. Oct. 7, 1996) (No. 96-5304).

#### 2.  *Expert Testimony*

An expert witness's opinion is admissible if it would be helpful to the jury.  FED. R. EVID. 702.  Rule 702 "allows experts to suggest an appropriate inference to be drawn from the facts in evidence if the expert's specialized knowledge is helpful in understanding the facts."  *Willey*, 57 F.3d at 1389.  Furthermore, an expert's opinion is not inadmissible just because it addresses an ultimate issue to be decided by the jury.  FED. R. EVID. 704(a); *United States v. Moore*, 997 F.2d 55, 57 (5th Cir. 1993).

12

There are two limitations on the rule that expert opinions on an ultimate issue are admissible.  First an expert may not express an opinion that amounts to a legal conclusion.  *United States v. Lueben*, 812 F.2d 179, 184 (5th Cir. 1987).  Second, an expert may not state an opinion as to a criminal defendant's mental state.  FED. R. EVID. 704(b).  We have held that "Rule 704(b) is not strictly construed and prohibits only a *direct* statement of the defendant's intent."  *United States v. Speer*, 30 F.3d 605, 610 (5th Cir.)(emphasis added), *cert. denied*, 115 S. Ct. 603 (1994), *and cert. denied*, 115 S. Ct. 768 (1995).

Piperi argues that the district court violated these rules by allowing into evidence the opinion of the government's banking practices expert, Margaret Keene, that the Orange Savings loan to Russo and the Ameriway Institutions loan to the Piperis were linked.  The government offered this evidence on the misapplication charge to allow the jury to infer that Piperi took the loan from the Ameriway Institutions intending to be influenced to make a similar loan to Russo.

Keene worked for nearly nine years as a lending officer and since 1982 has been doing consulting and training work for banks. She testified that, in her opinion, the loans were linked.  She based this opinion on several factors.  First, the structure of the loans was abnormal in that neither Russo's nor Piperi's financial condition would have withstood close scrutiny by a

lender, the loans were implemented outside of each institutions' typical procedures, and the loans were funded without sufficient supporting documentation. Second, although each of the loans was presented to the relevant loan committee with a stated acceptable purpose, that purpose was not the actual purpose for which the loan proceeds were used. Third, Keene looked at timing issues, noting that both loans were initially made on the same day and that there were mutual renewals and reductions in interest in 1987. Finally, Keene pointed to Drew Piperi's June 2 letter apparently discussing both loans.

Piperi objected to this testimony, contending that it conveyed a legal conclusion and an opinion about Piperi's mental state—*i.e.*, that Keene's testifying that the loans were "linked" was equivalent to testifying that Piperi "intended to be influenced" by the loan to him to fund a loan for Russo. Piperi relies on the Second Circuit's decision in *United States v. Scop*, 846 F.2d 135, 139 (2d Cir. 1988). In that case, the court held inadmissible as a legal conclusion the government's securities expert's opinion that the defendants were active and material participants in a fraudulent scheme to manipulate stock. *Id.* at 138. The court relied heavily on the expert's "repeated use of statutory and regulatory language indicating guilt," and his failure to "couch the opinion testimony at issue in even conclusory factual statements." *Id.* at 140, 142. By contrast,

14

Keene's testimony is factually based and is not framed by the statutory language at issue. She never actually testified that Piperi intended to be influenced by the Ameriway Institution's loans to him. Her opinion is more similar to an "ultimate factual conclusion[] that [is] dispositive of particular issues if believed," which *Scop* states would be admissible, than to inadmissible "inadequately explored legal criteria." *Id.* at 142. We are not convinced that *Scop* is sufficiently on point to be persuasive in this case.

Furthermore, the district court was careful to limit the boundaries of Keene's testimony and sustained several objections, along with instructions to the jury to disregard, where Keene crossed the line into testifying as to Piperi's mental state. At best, Keene testified indirectly as to Piperi's mental state, which does not violate Rule 704(b). *See Speer*, 30 F.3d at 610. Therefore, the district court did not abuse its discretion in allowing Keene to express her opinion that the loans were linked. *See Lueben*, 812 F.2d at 184 (holding admissible an expert opinion as to whether certain false statements would "have the capacity to influence" a loan officer, and comparing that opinion to an inadmissible opinion as to whether the false statements were "material").

### 3. *Civil Regulatory Violations*

"Evidence of violations of civil banking regulations cannot be used to establish criminal conduct."  *Parks*, 68 F.3d at 866; *United States v. Christo*, 614 F.2d 486, 492 (5th Cir. 1980). However, evidence of such violations is admissible "for the limited purpose of showing the defendants' motive or intent to commit the crime charged."  *Parks*, 68 F.3d at 866; *United States v. Stefan*, 784 F.2d 1093, 1098 (11th Cir.), *cert. denied*, 479 U.S. 855, *and cert. denied*, 479 U.S. 1009 (1986) (cited with approval in *United States v. Saks*, 964 F.2d 1514, 1523 (5th Cir. 1992)).

Piperi argues that the district court erred in admitting evidence of civil conflict of interest regulations. Specifically, Piperi contends that Keene's testimony that under civil conflict of interest regulations, Piperi should have disclosed to the Orange Savings loan committee that he was an Ameriway Institutions borrower, should not have been admitted. Piperi contends that admission of this evidence was harmful error because the government relied heavily on it, arguing that Piperi's failure to disclose the loan in violation of the regulations made the reciprocal lending arrangement equivalent to bank bribery and misapplication of funds.  Piperi claims the this error was so prejudicial that even the court's admonishments to the jury did not cure the error.

In this case, the government contends that it introduced evidence of violations of civil regulations merely to show that Piperi acted knowingly and with the intent to defraud in making the reciprocal lending arrangements. The government argued that the fact that Piperi failed to disclose his loan to the Orange Savings lending committee, along with several other facts—*i.e.*, that Drew Piperi falsely certified that certain documents were in the loan file when the loan was funded, that Piperi failed to conduct due diligence on the loan, that Piperi made material omissions and false statements on his financial statements—demonstrated his intent in arranging the reciprocal loans. This evidence allowed the jury to infer that Piperi acted with intent to defraud Orange Savings and the Ameriway Institutions (as per the bank fraud and misapplication counts) and that he corruptly solicited a loan with the intent to be influenced to make a loan to Russo (as per the bank bribery counts).

The district court instructed the jury, both during trial (at least five times) and in its final instructions, that violation of an internal policy or a civil regulation is not a crime and that evidence of such violations could be considered only as evidence of Piperi's intent. We have "recognized the value of limiting instructions in attenuating any improper effect of such evidence when used for a permissible purpose." *United*

17

*States v. Brechtel*, 997 F.2d 1108, 1115 (5th Cir.), *cert. denied*, 510 U.S. 1013 (1993).  Piperi has presented no reason why these limiting instructions were ineffective in this case.  Therefore, the district court did not abuse its discretion in admitting evidence that Piperi violated civil regulations and internal banking policies.

### 4.    *Other Wrongful Acts*

The government sought to prove that Piperi omitted liabilities from his personal financial statements presented to the Ameriway Institutions.  The government put on several witnesses to detail the liabilities omitted.  The government claims that it offered the circumstances of the debts to prove that their omission from the financial statements was not an oversight or mistake but was made intentionally in order to defraud the Ameriway Institutions.  Piperi offered to stipulate to the existence of the debts and their repayment status, but the government refused the stipulation because it did not go far enough, *i.e.*, Piperi would not stipulate to intent to defraud, which is the purpose for which the government offered the evidence.  Piperi argues that the government used the testimony establishing these liabilities to paint Piperi as a man of a generally dishonest character, in contravention of Rule 404(b).[4]

---

[4]  Federal Rule of Evidence 404(b) provides:

**Other crimes, wrongs, or acts.**  Evidence of other

Piperi further contends that even if the government offered the evidence for another purpose, the evidence is still inadmissible because the government did not give Piperi pretrial notice.

Specifically, Piperi challenges the following: (1) Frank Roberts's testimony that documents related to a real estate loan on property which Roberts acquired as trustee for Piperi were signed in his name without his permission, which Piperi contends is an allegation that Piperi forged the documents; (2) Roberts's and Cyd West's testimony that Piperi moved large sums of money into Roberts's and Piperi's joint escrow account, purchased cashier's checks out of the account, and used the cashier's checks to make payment on loans; (3) James Boyle's testimony that Piperi was guarantor on a loan related to the sale of a Houston motel, that the debt was in default and was never repaid, and that Piperi filed for bankruptcy and his debt to Boyle was listed on his bankruptcy schedule; and (4) Kathryn Patton's testimony relating the existence of one of Piperi's loans by showing the

---

crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

debt and its repayment history as it appeared on Piperi's bankruptcy schedule.

The trial court apparently admitted this evidence of the omissions from Piperi's financial statements on the theory that it was intrinsic to the charged crimes of bank fraud and bank bribery and thus did not implicate Rule 404(b). We agree with the trial court. While use of evidence of extrinsic bad acts triggers the provisions of Rule 404(b), evidence of intrinsic other acts is admissible without reference to Rule 404(b). *Coleman*, 78 F.3d at 156; *United States v. Dula*, 989 F.2d 772, 777 (5th Cir.), *cert. denied*, 510 U.S. 859 (1993). Evidence of other acts is intrinsic "when the evidence of the other act and evidence of the crime are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." *Coleman*, 78 F.3d at 156 (internal quotations omitted); *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990) (internal quotations omitted).

The details of the omissions from Piperi's financial statements were inextricably intertwined with the manner in which Piperi was charged with committing the crimes of bank fraud and bank bribery. The evidence allowed the jury to infer that Piperi omitted the information from his financial statement not by mistake or oversight but to defraud the Ameriway Institutions in order to receive a loan he would not otherwise be able to

receive.  The prosecution was entitled to "offer all of the surrounding circumstances that were relevant" in developing proof of this intent.  *Dula*, 989 F.2d at 777.  The details of the omitted material were merely the circumstances surrounding the crime, and thus the district court did not err in admitting this evidence.  *See also United States v. Campbell*, 64 F.3d 967, 978 n.16 (5th Cir. 1995) (noting the evidence of defendant's financial difficulties was properly admitted as relevant to intent to deceive in a false entry count).

**B.    CLOSING ARGUMENT**

Piperi argues that the prosecutor engaged in three separate acts of misconduct in his closing argument.  First, Piperi argues that the prosecutor's comments that "you don't look at banks as personal piggy banks," implying that "the taxpayers" will pay, and that the regulators "screw[ed] up" by allowing real estate developers to "play[] fast and loose with other people's money," were improper because they were calculated to inflame the prejudices of the jurors and because there was no evidence in the record that taxpayers bore the loss caused by the transaction at issue.  Piperi claims that the taxpayer remark is especially prejudicial because of the concern expressed by the jurors during voir dire about the taxpayer bailout of the savings and loan industry.  Second, Piperi contends that the prosecutor's reference to his failure to plead guilty undermined the

presumption of innocence and was not cured by the district court's curative instruction given the next day as part of the final jury charge. Third, Piperi contends that the prosecutor's statement that Piperi "snooker[ed]" Iona Norred out of her inheritance was improper and was not cured by the district court's instruction to disregard the prosecutor's use of the word snookered. Piperi argues that evidence related to the Norred transaction was admitted only to show that Piperi's debt to Norred was omitted from his financial statements and that whether the debt was eventually paid is irrelevant for this purpose. Piperi contends that these three improper arguments, considered cumulatively, constituted prejudicial and reversible error.

In reviewing a claim of prosecutorial misconduct to which the defendant objected at trial, we first determine whether the prosecutor's remarks were improper and then whether they prejudicially affected the substantial rights of the defendant. *United States v. Fields*, 72 F.3d 1200, 1207 (5th Cir.), *cert. denied*, 64 U.S.L.W. 3709 (U.S. Oct. 7, 1996) (No. 95-1639), *and cert. denied*, 1996 WL 375773 (U.S. Oct. 7, 1996) (No. 95-9441). We consider the following factors: (1) the magnitude of the prejudicial effect of the statements, (2) the efficacy of any curative instruction, and (3) the strength of the evidence of the defendant's guilt. *Id.; United States v. Levine*, 80 F.3d 129, 135 (5th Cir.), *cert. denied*, 65 U.S.L.W. 3001 (U.S. Oct. 7,

22

1996) (No. 95-2066).  "We will reverse a conviction for prosecutorial misconduct only if the misconduct was so pronounced and persistent that it casts serious doubts upon the correctness of the jury's verdict."  *United States v. Bentley-Smith*, 2 F.3d 1368, 1378 (5th Cir. 1993).

First, Piperi claims that the prosecutor's taxpayer comments were improper because they were outside the record and intended to inflame the jury.  Although "[c]ounsel is not permitted to make an appeal to passion or prejudice calculated to inflame the jury," *United States v. Crooks*, 83 F.3d 103, 107 n.15 (5th Cir. 1996), the prosecutor's stray remark about a loss to taxpayers does not have a strong enough prejudicial effect to constitute reversible error.

Second, Piperi challenges the prosecutor's comment on the failure to plead guilty.  This comment was clearly improper.  *See United States v. Tomblin*, 46 F.3d 1369, 1390 (5th Cir. 1995).  However, the district court gave a curative instruction, reminding the jury that the defendants are presumed innocent throughout the trial and ordering them to disregard the prosecutor's comment.  The jury is presumed to have followed the court's instructions.  *Levine*, 80 F.3d at 136.  The fact that this instruction was not given immediately, but the next day as part of the final jury charge, does not render it ineffective.  *See id.* (stating that as long as curative instructions are given

23

in time to provide corrective guidance to the jury, they are not too late to protect the defendant's rights).  Therefore, the prosecutor's comments, although improper, do not constitute reversible error.

Third, Piperi challenges the prosecutor's statement that Piperi "snooker[ed]" Norred out of her inheritance.  The evidence relating the circumstances of Norred's loan to Piperi was offered by the government only for the purpose of showing that Piperi intentionally omitted this liability from his financial statement.  The prosecutor should not have argued about the losses caused by Piperi's failure to repay that loan, because such argument treats this evidence as character evidence prohibited by Rule 404(b).  However, these improper comments, when considered in light of the record as a whole and the evidence against Piperi, did not prejudice Piperi's substantial rights.

The evidence of Piperi's guilt is substantial.  These three brief statements, given over the course of a two-hour closing argument, were not so persistent and pronounced as to make us seriously doubt the correctness of the verdict.  *See Levine*, 80 F.3d at 135; *Bentley-Smith*, 2 F.3d at 1378.  Accordingly, the prosecutor's improper remarks during closing argument do not constitute reversible error.

C.   **JURY INSTRUCTIONS**

Piperi contends that the district court committed plain error by not instructing the jury that it had to find that Piperi made material misrepresentations to the financial institutions in order to find him guilty on the misapplication of funds charge. He reasons that because count nine of the indictment accused Piperi of "unlawfully causing the funding of a loan . . . by misrepresenting material facts to officers and directors of Orange Savings," materiality of the misrepresentation is an element of the crime, and a jury instruction on materiality is required by *United States v. Gaudin*, 115 S. Ct. 2310 (1995). Piperi acknowledges that he did not object to the charge on this ground, and thus we review for plain error only. *See United States v. Olano*, 113 S. Ct. 1770, 1776 (1993); *United States v. Calverley*, 37 F.3d 160, 162 (5th Cir. 1994)(en banc), *cert. denied*, 115 S. Ct. 1266 (1995).

In *Gaudin*, the Supreme Court held that "[t]he Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged." *Gaudin*, 115 S. Ct. at 2320. The Court determined that "where materiality is an element of the charged offense, the trial court's failure to submit the question of materiality to the jury violates the defendant's Fifth and Sixth Amendment rights." *United States v. Jobe*, 77 F.3d 1461,

25

1474 (5th Cir. 1996), *amended on reh'g on other grounds*, 90 F.3d 920 (5th Cir. 1996).

The elements of misapplication of funds in violation of 18 U.S.C. § 657 are as follows: (1) the savings and loan institution was authorized under United States law; (2) the accused was an officer, director, or employee of the institution; (3) the accused knowingly and willfully misapplied the funds of the institution; and (4) the accused acted with intent to injure or defraud the institution. *Parks*, 68 F.3d at 863. Material misrepresentation simply is not an element of misapplication of funds. The fact that the indictment listed "misrepresenting material facts" as a part of the manner and means of the misapplication charge did not transform materiality into an element of the offense.[5] Therefore, the district court did not plainly err in failing to instruct the jury that it must find that Piperi made material misrepresentations to Orange Savings in order to convict him for misapplication of funds.

**D.    SUFFICIENCY OF THE EVIDENCE**

---

[5]  Piperi cites *United States v. Heath*, 970 F.2d 1397 (5th Cir. 1992), *cert. denied*, 507 U.S. 1004 (1993) to argue that materiality is an element of a § 657 violation. *Heath* involved alleged violations of § 657 and § 1344. The court analyzed them together and discussed the materiality of certain statements. *Id.* at 1403. However, *Heath* is not helpful here for two reasons. First, *Heath* did not clearly hold, or even imply, that materiality is an element of § 657. Second, materiality is an element of § 1344, *see United States v. Campbell*, 64 F.3d 967, 975 (5th Cir. 1995), and thus the court's analysis should properly be construed as applying to the § 1344 claim.

26

The scope of our review of the sufficiency of evidence after conviction by a jury is narrow. We must affirm if a reasonable trier of fact could have found that the evidence established the essential elements of the crime beyond a reasonable doubt. *United States v. Dobbs*, 63 F.3d 391, 394 (5th Cir. 1995). We must consider the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the government. *Id.*

Piperi argues that the evidence is insufficient to support two elements necessary to his conviction: (1) that he "accepted anything of value, particularly of a value exceeding $100" (bank bribery) and (2) that he acted corruptly or with an intent to defraud (bank bribery and misapplication of funds). We disagree. After reviewing the evidence, we have determined that the evidence is sufficient to allow a reasonable jury to infer that Piperi and Russo agreed to exchange millions of dollars worth of loans. Promising to give a loan from the defendant's bank to secure a loan from another bank qualifies as "value" under § 215. *United States v. Kelly*, 973 F.2d 1145, 1152 (5th Cir. 1992). Furthermore, the evidence was sufficient to allow a reasonable jury to infer that Piperi acted corruptly or with intent to defraud. The government presented evidence that Piperi failed to conduct due diligence on the loan to Russo, that Drew Piperi falsely certified that certain documents were in the loan file when the loan was funded, that Piperi misrepresented the true

27

purpose of the loan he received from the Ameriway Institutions, that Piperi failed to disclose that his institution was making a loan to the owner of the institution he borrowed from, that the dates on certain documents had been tampered with, and that Piperi provided false and incomplete information on his financial disclosure. Viewing the evidence in the light most favorable to the verdict, there was sufficient evidence to support Piperi's conviction.

**E.    SENTENCING**

"A district court's determination that a defendant is a § 3B1.1 leader or organizer is a factual finding, which we review for clear error." *United States v. Ronning*, 47 F.3d 710, 711 (5th Cir. 1995). Section 3B1.1(a) of the United States Sentencing Guidelines ("USSG") directs the district court to increase a defendant's offense level by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." USSG § 3B1.1(a).

The Presentence Investigation Report determined that Piperi's sentence should be enhanced by four points because he was the leader of a criminal activity that is "otherwise extensive" because Piperi directed his son Drew Piperi and the scheme involved at least Piperi, Drew Piperi, Russo, and many unknowing participants, such as the employees at Orange Savings.

28

*See* USSG § 3B1.1 comment. note 3 ("In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.").

The district court adopted the findings of the Presentence Investigation Report. The record clearly shows that the criminal organization involved at least three participants (Piperi, Drew Piperi, and Russo) and involved the help of many unknowing outsiders such as Piperi's employees. Thus, the district court did not clearly err in determining that Piperi's offense level should be increased by four points under USSG § 3B1.1(a).

### III. CONCLUSION

For the foregoing reasons, we AFFIRM.

29